937 P.2d 1212

Jessie Anna MORRIS, a Minor By and Through Jackie MORRIS, her Mother and Natural Guardian, Plaintiff–Appellant,

v.

James THOMSON, M.D., individually, Defendant–Respondent.

No. 22202.

Supreme Court of Idaho,
Boise, December 1996 Term.

May 15, 1997.

Wilson & McColl, Boise, for plaintiff–appellant. Debrha J. Carnahan argued.

Quane, Smith, Howard and Hull, Boise, for defendant–respondent. Jeremiah A. Quane, argued.

TROUT, Chief Justice.

This is an appeal from a jury verdict and judgment for defendant Dr. James Thomson in a medical malpractice suit.

## I.

### BACKGROUND

On July 4, 1988, Jessie Morris (Jessie) was born to Jackie Morris (Morris) at Walter Knox Memorial Hospital in Emmett, Idaho. Dr. James Thomson, a family practitioner in Emmett and Morris' treating physician during her pregnancy, delivered Jessie, who experienced birth asphyxia (oxygen deprivation immediately before or after birth). As a result, she suffers from severe mental retardation, cerebral palsy, vision impairment, microcephaly (small head), and paralysis.

## II.

### PROCEDURAL HISTORY

On May 11, 1990, Jackie Morris, on behalf of her daughter, filed a medical malpractice suit against Dr. Thomson and Walter Knox Memorial Hospital. Morris and the hospital reached a settlement prior to trial. At trial, Morris alleged that Thomson did not meet the required standard of care by improperly using a fetal heart monitor, improperly interpreting the fetal heart monitor data, failing

to use a fetal scalp monitor, and failing to recognize signs of distress after birth and to begin immediate resuscitation efforts. The jury returned a verdict for Dr. Thomson on April 24, 1995. On May 24, 1995, Morris filed motions for a new trial and to alter or amend the judgment. On August 31, 1995, the district court denied these motions. Morris subsequently appealed to this Court several of the court's rulings made prior to and during the trial.

## III.

## DISCUSSION

**A. The district court's refusal to automatically dismiss for cause all potential jurors having a doctor-patient relationship with defendant Dr. Thomson.**

At the beginning of jury selection, Morris sought to automatically excuse for cause all potential jurors who were patients of Dr. Thomson on the ground that a business relationship existed between them and the defendant. *See* I.R.C.P. 47(h)(3). The court denied this request, ruling that plaintiff would have to question each individual juror on this issue. Morris appeals this ruling.

Plaintiff urges this Court to adopt a per se rule in medical malpractice actions automatically disqualifying all prospective jurors with current doctor-patient relationships with the defendant. We decline to do so. The court in *Poynter ex rel. Poynter v. Ratcliff,* 874 F.2d 219 (4th Cir.1989), addressed the issue of whether to adopt such a rule. The court refused to do so on the ground that per se rules should be created only in exceptional situations where "circumstances, such as a [a juror's] financial interest in the trial's outcome, show a clear likelihood of prejudice." *Id.* at 222. The doctor-patient relationship, however, does not create a clear risk of prejudice. *Id.* Although the bond between a doctor and a particular patient may pose such a risk, the determination of whether the doctor-patient relationship affects a juror's impartiality should be made on an individual basis:

> Although a particular patient or malpractice defendant might warrant, or require,

excuse for cause in a given case, we do not think that either circumstance necessarily impairs a juror's partiality or prevents him from rendering a decision based solely on the evidence and the law. The decision whether to exclude [current patients] should be made in each instance on the particular facts involved and under the established principles governing excuse for cause.

*Id.* (footnote omitted).

■ This reasoning is persuasive, and we likewise refuse to create a per se rule automatically disqualifying such jurors. By requiring counsel to question individually each prospective juror regarding his or her relationship with defendant, counsel will be able to uncover any bias and to challenge such a juror for cause. As the case at bar demonstrates, the court will likely dismiss these jurors on the ground that they are biased. A per se rule would thus provide no protection for plaintiffs in medical malpractice cases that they do not already enjoy. In medical malpractice actions, then, the parties may challenge for cause current and/or former patients of the defendant doctor or remove them through use of peremptory challenges.

■ Plaintiff also argues that these jurors should have been excused pursuant to I.R.C.P. 47(h)(3) as being "united in business" with defendant. I.R.C.P. 47(h)(3) provides that one basis for a challenge for cause is "being ... united in business with either party." A doctor-patient relationship, however, does not fall within this provision. This Court has examined the phrase "united in business" found in an earlier (but identical) version of this rule. *See Hall v. Chattin,* 17 Idaho 664, 106 P. 1132 (1910). "Business" for purposes of that section constituted "commercial, industrial and professional enterprises and engagements into which men jointly enter." *Id.* at 668, 106 P. at 1133. We noted that the purpose behind this provision was to exclude from juries those individuals whose business or financial interests could be affected by the outcome of the litigation: "It was evidently not thought wise or in the interests of justice to have a man's business associate act as a juror in a case where his business,

moneyed, or other interests are at stake." *Id.*, 106 P. at 1133. Clearly, a doctor-patient relationship does not implicate a juror's financial interests. By participating in a verdict against his or her doctor in a medical malpractice action, a juror does not affect his or her financial or business interests. The doctor-patient relationship thus does not create the sort of bias that the rule seeks to prevent, and the "united in business" provision does not apply. The court thus correctly refused to automatically dismiss the jurors on this ground.

■ Plaintiff also objected specifically to certain jurors included in the panel on the basis that they, or their family members, are or were patients of Dr. Thomson. The record indicates, however, that Morris failed to challenge for cause the majority of these jurors, and the court excused all of the jurors plaintiff challenged for cause on the basis of their relationship with defendant, with the exception of Juror Hill (which will be discussed below). These excused jurors, of course, present no issue on which Morris can appeal. With regard to the other jurors plaintiff failed to challenge, plaintiff waived all objections to them by passing them for cause. *State v. Mitchell*, 104 Idaho 493, 501, 660 P.2d 1336, 1344, *cert. denied*, 461 U.S. 934, 103 S.Ct. 2101, 77 L.Ed.2d 308 (1983); *State v. Bitz*, 93 Idaho 239, 243, 460 P.2d 374, 378 (1969); *State v. Yon*, 115 Idaho 907, 909, 771 P.2d 925, 927 (Ct.App.1989). Plaintiff has thus failed to preserve this issue for appeal.

## B. The district court's refusal to dismiss for cause Mrs. Hill, a potential juror with a doctor-patient relationship with defendant Dr. Thomson.

The second prospective juror questioned, Mrs. Hill, was a former (and possibly current) patient of Dr. Thomson.[1] Morris challenged Hill for cause. After further questioning by both the defense and the court, the court satisfied itself that Hill could remain impartial and denied plaintiff's motion to excuse her for cause. Morris subsequent-

ly passed Hill for cause but used a peremptory challenge to remove her. Morris appeals the trial court's denial of this challenge.

■ It is in the trial court's discretion to determine whether a juror can render a fair and impartial verdict. *State v. Hedger*, 115 Idaho 598, 600, 768 P.2d 1331, 1333 (1989); *Quincy v. Joint Sch. Dist. No. 41, Benewah County*, 102 Idaho 764, 768, 640 P.2d 304, 308 (1981). On appeal, we review the trial court's selection of jurors for an abuse of discretion. *Hedger*, 115 Idaho at 600, 768 P.2d at 1333; *Quincy*, 102 Idaho at 768, 640 P.2d at 308. In ruling on a challenge for cause, the trial court must consider the facts and decide if the juror should be excused pursuant to I.R.C.P. 47(h), which sets forth the grounds for challenges for cause. *Quincy*, 102 Idaho at 768, 640 P.2d at 308.

■ The trial court in this case did not abuse its discretion in refusing to dismiss Hill for cause. In the two Idaho cases addressing this issue, the Court has ruled that a trial court does not abuse its discretion by refusing to excuse for cause jurors whose answers during voir dire initially give rise to challenges for cause but who later assure the court that they will be able to remain fair and impartial:

> Although the *voir dire* of Mr. Pugh [the prospective juror] by plaintiff's counsel initially gave reason to challenge for cause, subsequent questioning by the court clarified the responses of Mr. Pugh so as to give the court ample basis for concluding that Mr. Pugh would serve as a fair and impartial juror. In view of these answers given by Mr. Pugh to the court's questions, it was clearly within the court's discretion to deny plaintiff's challenges for cause.

*Quincy*, 102 Idaho at 768, 640 P.2d at 308. *See also Hedger*, 115 Idaho at 600, 768 P.2d at 1333 (upholding trial court's decision, in trial of defendant on criminal charges including rape, refusing to excuse for cause prospective juror whose first husband had been convicted of rape, whose current husband had pled guilty to sexual abuse three years

---

1. It is unclear from the record whether Hill was a current or former patient. She stated that Dr. Thomson had taken over from her original doctor and that if she were to go back to a doctor, she would probably return to him. She had not, however, seen him in over one year.

previously, and who had worked for two years with a support group for victims of domestic abuse).

Such a situation exists in this case. Hill initially stated during voir dire that she believed that her relationship with Dr. Thomson could affect her ability to render a verdict fair to plaintiff. Such bias is a ground for a challenge for cause. *See* I.R.C.P. 47(h)(7). Further questioning by defense counsel, however, elicited Hill's assurance that she would put aside her relationship with Dr. Thomson, endeavor to remain impartial, and follow the court's instructions:

Q: .... does that mean that you couldn't be impartial and fair?

A: No. I can understand—my three daughters are perfectly healthy, but I can see where she is coming from.

Q: Because her child is handicapped.

A: Yes.

Q: Well, because you think that you wouldn't want someone in your frame of mind sitting on your jury if you were bringing a case, does that mean that you—you wouldn't certainly be unfair to either side, I take it.

A: No, I wouldn't.

Q: And you would obey the judge's instructions, I take it.

A: Yes, I would.

Q: And you would be as impartial as possible.

A: Yes, I would.

* * *

Q: I take it that if you do get selected to sit on a jury, you would give the Court your assurances, and the rest of us, that despite your knowledge of Dr. Thomson, ... that you would follow the Court's instructions and be impartial.

A: Yes, I would.

The court further questioned Hill regarding any potential bias:

Q: Mrs. Hill, as I understand it, your response to the plaintiff was that you were thinking that she may not want to have somebody that is connected to the doctor in some fashion sit in the jury. What I am asking you is, can you put that relationship aside?

A: Yes.

Q: —and hear what is going to be presented by both sides, and then whatever you determine the facts to be, be able to apply the law that the Court will instruct you on and come to your own decision.

A: Yes, I could.

Q: And you could do it without being biased towards one party or the other.

A: Yes.

Court: I will deny the motion to excuse for cause.

The court did not deny plaintiff's challenge until it had assured itself that Hill could remain impartial. The court thus did not abuse its discretion by failing to dismiss her for cause.

## C. Communications between defense counsel and Jessie's former treating physicians without notice to plaintiff and outside the course of formal discovery.

During the course of the trial, Morris discovered that Thomson's attorney had spoken, without notice to plaintiff and outside formal discovery channels, with two physicians who had treated Jessie during the first month of her life. Thomson retained one of these physicians, Dr. Sell, as an expert witness. At the time of trial, however, Dr. Sell refused to testify. Morris called Dr. Watkins, the other physician, as a fact witness and learned of defense counsel's contact during Dr. Watkins' testimony. Plaintiff asserts that these communications between defense counsel and plaintiff's former treating physicians were improper because they occurred outside the procedures outlined in the discovery rules and argues that they constitute error because they resulted in changes in the doctors' testimony at trial.

### 1. Dr. Sell

■ Plaintiff cannot assert error with regard to Dr. Sell because she has not demonstrated that defense counsel's communication

with Dr. Sell in any way prejudiced her. The record does not indicate that their discussion had any effect on Dr. Sell's opinion or on his testimony, as he did not testify at trial.

### 2. Dr. Watkins

■ Morris did not object at trial to defense counsel's ex parte communication with Dr. Watkins and thus did not preserve this issue for appeal. *Lawton v. City of Pocatello,* 126 Idaho 454, 464–65, 886 P.2d 330, 340–41 (1994); *Lankford v. Nicholson Mfg. Co.,* 126 Idaho 187, 189, 879 P.2d 1120, 1122 (1994). *See also Pearce v. Ollie,* 121 Idaho 539, 540, 826 P.2d 888, 889 (1992) (learning that defense counsel had conducted ex parte interviews with plaintiff's treating physicians and had retained them as witnesses for the defense, plaintiff moved to prevent the defense from calling these witnesses).

■ Furthermore, the formal discovery rules do not preclude informal communications between defense counsel and ordinary fact witnesses. It is clear that plaintiff did not retain Dr. Watkins as an expert witness in anticipation of litigation and did not call Dr. Watkins to testify regarding any expert opinions formed. Instead, plaintiff called Dr. Watkins to testify to her direct observations of Jessie. As a fact witness, the discovery rules do not limit defense counsel's access to Dr. Watkins, and the defense is free to speak to the witness if she is willing.

### D. The district court's refusal to allow Morris to question her own witness, Dr. Watkins, regarding prior statements the witness made concerning her opinion as to the timing of Jessie's injuries.

During Morris' direct examination of Dr. Watkins, counsel repeatedly used the term "birth asphyxia." Defense counsel apparently feared that the jury would construe this term to mean that Dr. Watkins was opining that the injuries occurred during the birthing process. Consequently, in his cross-examination, defendant attempted to clarify whether Dr. Watkins was offering an opinion as to the timing of Jessie's injuries, and Dr. Watkins asserted that she had no opinion as to

the timing of the events leading to Jessie's condition. In her redirect, Morris attempted to show that Dr. Watkins did indeed have such an opinion and that the doctor had expressed that opinion to plaintiff's counsel during a prior conversation. The defense objected, and the court sustained the objection, apparently on the ground that plaintiff had not called Dr. Watkins as an expert qualified to render such an opinion.

■ We do not address this issue because Morris has not preserved it for appeal. I.R.E. 103(a)(2) provides that a party can only assert error on the part of the trial court in excluding evidence where the party made an offer of proof at trial describing the substance of the evidence sought to be admitted. Plaintiff, however, did not make an offer of proof regarding the testimony she intended to elicit from Dr. Watkins on redirect, and we thus do not have any basis on which to rule.

### E. The district court's striking a portion of the testimony of plaintiff's expert witness, Dr. Giles, that referred to the standard of care requiring the use of a fetal scalp monitor.

Prior to the beginning of trial, Morris moved to exclude evidence pertaining to her history of sexually-transmitted diseases (STDs). The judge granted the motion, ruling that no mention could be made of Morris' history due to the highly prejudicial impact such evidence could have on the jury. During her case-in-chief, Morris called an expert witness, Dr. Giles, to testify to the standard of care required of a family practitioner in Emmett, Idaho, at the time of Jessie's birth. Among other things, Dr. Giles testified that the standard of care required that a fetal scalp monitor be used when a fetus exhibits signs of distress such as Jessie's. To rebut this testimony, the defense during its case-in-chief called Dr. Clark, another expert witness. The defense made an offer of proof outside the presence of the jury that Dr. Clark would testify that Morris' history of STDs contraindicated the use of a fetal scalp monitor because the electrode pierces the scalp of the fetus and exposes the fetus to

potential infection. Morris continued to object strongly to any reference to STDs, and the court refused to allow any mention of the mother's medical history. Defendant then moved to strike that portion of Dr. Giles' testimony referring to the standard of care requiring the use of a fetal scalp monitor. The court granted the motion and instructed the jury to disregard that portion of Dr. Giles' testimony.

■ Again, Morris asserts that the district court erroneously excluded evidence. The Court reviews trial court decisions admitting or excluding evidence, including the testimony of expert witnesses, under the abuse of discretion standard. *Burgess v. Salmon River Canal Co., Ltd.*, 127 Idaho 565, 574, 903 P.2d 730, 739 (1995). In the case of an incorrect ruling regarding evidence, a new trial is merited only if the error affects a substantial right of one of the parties. I.R.C.P. 61; I.R.E. 103; *Burgess*, 127 Idaho at 574, 903 P.2d at 739; *Hake v. DeLane*, 117 Idaho 1058, 1065, 793 P.2d 1230, 1237 (1990).

■ Morris first argues that the district court erred in striking this testimony because defendant's motion to strike was untimely. Regardless of whether the motion was untimely, the trial court may exclude evidence offered by a party on its own authority, without a motion to strike or an objection made by the opposing party. *See Hecla Mining Co. v. Star–Morning Mining Co.*, 122 Idaho 778, 782–83, 839 P.2d 1192, 1196–97 (1992).

■ We hold that the trial court did not abuse its discretion in excluding the testimony at issue. The court was in a difficult position. Had the court refused to allow the defense to present evidence regarding Morris' history of STDs and also refused to strike Dr. Giles' testimony regarding the use of a fetal scalp monitor, substantial rights of *defendant* would have been impaired. Such a ruling would have considerably prejudiced defendant by preventing him from rebutting one allegation that he had violated the applicable standard of care. The judge's decision to exclude all reference to Morris' medical history to prevent prejudice to Morris would,

in the specific instance of Dr. Giles' testimony on this point, have seriously prejudiced defendant. The court remedied this situation by striking that portion of Dr. Giles' testimony. In this manner, it prevented prejudice both to Morris (by not allowing defendant to refer to Morris' medical history) and to Thomson (by striking testimony of Morris' witness that Thomson could not rebut without referring to this medical history). This ruling was a reasonable compromise and did not constitute an abuse of discretion.

## F. Special verdict form and Jury Instruction No. 15, which instructed the jury on the standard of care in medical malpractice cases.

### 1. Special verdict form

Morris did not discuss this issue in her briefs submitted to this Court. We thus refuse to address it. *City of Sun Valley v. Sun Valley Co.*, 128 Idaho 219, 223, 912 P.2d 106, 110 (1996) ("We will not address issues on appeal which are completely without support, argument, or authority.").

### 2. Jury Instruction No. 15

■ The district court gave the following instruction to the jury regarding the standard of care in medical malpractice cases:

The Idaho statute governing the proof of community standard of health care practice in a malpractice case provides, in relevant part, as follows: In any claim for damages against any physician such plaintiff must, as an essential part of his or her case in chief, affirmatively prove by direct expert testimony and by a preponderance of all the competent evidence, that such physician then and there negligently failed to meet the applicable standard of health care practice of the community in which such care allegedly was or should have been provided, as such standard existed at the time and place of the alleged negligence of such physician and as such standard then and there existed with respect to the class of physician that such physician then and there belonged to and in which capacity he or she was functioning.

Such physician shall be judged in such cases in comparison with similarly trained and qualified physicians of the same class in the same community, taking into account his or her training, experience, and fields of medical specialization, if any. *If there be no other like physician in the community and the standard of practice is therefore indeterminable, evidence of such standard in similar Idaho communities at said time may be considered.*

The term "community" refers to that geographical area ordinarily served by the licensed general hospital at or nearest to which such care was provided.

(emphasis added). Although Morris did not object to this instruction at trial, the challenge to a jury instruction is nonetheless preserved for appeal. *Lubcke v. Boise City/ Ada County Hous. Auth.*, 124 Idaho 450, 463, 860 P.2d 653, 666 (1993). On appeal, we review the jury instructions as a whole to determine whether they "fairly and adequately present the issues and state the applicable law." *Lawton*, 126 Idaho at 462, 886 P.2d at 338. If an instruction misleads the jury or prejudices one of the parties, reversible error occurs. *Id.*, 886 P.2d at 338.

Morris' objection focuses upon the italicized portion of the instruction regarding proof of the local standard of care. Morris contends that the instruction erroneously limits the jury's consideration of the standard of care in "similar" communities to situations where, within the local community, there is no doctor (other than defendant) competent to testify to the local standard of care. Thus, according to Morris, the judge instructed the jury to ignore the testimony of Morris' expert, Dr. Giles, because Dr. Holverson, a doctor practicing in the local community and

the defense's expert witness, was qualified to give an opinion as to the local standard of care. Morris argues that this is contrary to both statutes and case law which establish that plaintiffs may call non-local, and even out-of-state, experts to testify to the standard of care. Morris' argument fails for two reasons.

█ First, the instruction given mirrors the language of I.C. § 6–1012, which defines the standard of care in medical malpractice actions in Idaho. Section 6–1012 provides, in relevant part: "If there be no other like provider in the community and the standard of practice is therefore indeterminable, evidence of such standard in similar Idaho communities at said time may be considered." We have consistently upheld instructions based upon § 6–1012 as correctly explaining to the jury the applicable standard of care. *Leazer v. Kiefer*, 120 Idaho 902, 905, 821 P.2d 957, 960 (1991); *Robertson v. Richards*, 115 Idaho 628, 633, 769 P.2d 505, 510 (1987) (on rehearing, 1989). In addition, the instructions upheld in *Robertson* are very similar to those at issue in the instant case.[2] *Robertson*, 115 Idaho at 633 n. 4, 769 P.2d at 510 n. 4. In *Leazer*, we stated that we preferred the instructions given in *Robertson* because they "accurately state the standard of care pursuant to I.C. § 6–1012." *Leazer*, 120 Idaho at 906, 821 P.2d at 961.

Second, the relevant statutes and case law support the instruction as given. Section 6–1012 provides that plaintiffs may refer to the standard of care in similar communities when the standard of care in the same community is indeterminable because no doctor other than defendant practices in that community.

* * *

2. The court in *Robertson* instructed the jury:

INSTRUCTION NO. 12

The plaintiffs in a medical malpractice case have the burden of proving, by direct expert testimony and by a preponderance of all competent evidence, that *at the time and place of the alleged incident* in question, the defendant negligently failed to meet the applicable standard of health care practiced *in the community in which such care allegedly was or should have been provided* as such standard then existed with respect to the class of health care provider to which the defendant belonged and in which he was functioning.

INSTRUCTION NO. 13

An individual provider of health care, such as the defendant in this case, shall be judged in comparison with similarly trained and qualified providers of the same class *in the same community*, taking into account training, experience, and field of specialization.

*Robertson*, 115 Idaho at 633 n. 4, 769 P.2d at 510 n. 4 (emphasis added). The instruction makes no mention of establishing the applicable standard of care by reference to similar communities.

Morris argues that § 6–1013 and case law modify this portion of § 6–1012 to broaden the context in which plaintiffs may refer to the standard of care in similar communities. Morris, however, is incorrect. Section 6–1013, entitled "Testimony of expert witness on community standard," establishes the method by which both local and non-local experts may testify regarding the standard of care:

> The applicable standard of practice and such a defendant's failure to meet said standard must be established in such cases by such a plaintiff by testimony of one (1) or more knowledgeable, competent expert witnesses, and such expert testimony may only be admitted in evidence if the foundation therefor is first laid, establishing (a) that such an opinion is actually held by the expert witness, (b) that the said opinion can be testified to with reasonable medical certainty, and (c) that such expert witness possesses professional knowledge and expertise coupled with actual knowledge of the *applicable said community standard* to which his or her expert opinion testimony is addressed; provided, this section shall not be construed to prohibit or otherwise preclude a competent expert witness who resides elsewhere from *adequately familiarizing himself* with the standards and practices of *(a particular) such area* and thereafter giving opinion testimony in such a trial.

(emphasis added). This section does not require the *court* to allow *non-local* experts to testify regarding the standard of care in "similar" communities. Instead, it allows non-local experts to familiarize themselves with the "applicable said community standard." Section 6–1012, in turn, defines the applicable community standard in specific instances. As we have already explained, that section provides that a plaintiff may establish the community standard of care by reference to similar communities only where no local doctor other than the defendant exists and the local standard is thus indeterminable. In the instant case, Dr. Holverson was a doctor practicing in the relevant community at the time of Thomson's alleged malpractice. The local standard of care was thus determinable, and § 6–1012 does not allow Morris to establish the standard of care by reference to the standard in similar communities. Thus, the judge correctly instructed the jury.

Contrary to Morris' assertions, the associated case law does not lead to a different conclusion. We have upheld trial court decisions holding that plaintiffs' non-local experts did not familiarize themselves adequately with the standard of care in the community in which the malpractice allegedly occurred. In *Dekker v. Magic Valley Regional Medical Center,* 115 Idaho 332, 766 P.2d 1213 (1988), the affidavits of plaintiff's out-of-state experts did not demonstrate any knowledge of the standard of care in the community. We upheld the trial court's granting of defendant's summary judgment motion on the ground that § 6–1013 requires actual knowledge of the standard of care in the community where the alleged malpractice occurred. *Id.* at 334, 766 P.2d at 1215. In *Gubler v. Boe,* 120 Idaho 294, 815 P.2d 1034 (1991), the trial court excluded the testimony of plaintiff's expert because he had not familiarized himself with the community standard of care (that of Pocatello). Instead, he had spoken only with a doctor practicing in Idaho Falls. We upheld the district court's decision, noting that the expert had not familiarized himself with the local standard in Pocatello as required by § 6–1012, a statute which is site-specific. *Id.* at 296, 815 P.2d at 1036. Non-local experts may, of course, familiarize themselves with the local standard of care by speaking with doctors practicing in the community in which the malpractice allegedly occurred. *See, e.g., Dunlap ex rel. Dunlap v. Garner,* 127 Idaho 599, 606, 903 P.2d 1296, 1303 (1994); *Watts v. Lynn,* 125 Idaho 341, 345, 870 P.2d 1300, 1304 (1994); *Kozlowski v. Rush,* 121 Idaho 825, 827–30, 828 P.2d 854, 856–59 (1992).

The only case in which we have addressed the issue of when a plaintiff may establish the community standard of care by reference to *similar* communities within Idaho is *Hoene v. Barnes,* 121 Idaho 752, 828 P.2d 315 (1992). In that case, we considered the portion of § 6–1012 at issue in the instant case: "If there be no other like provider in the community and the standard of practice is therefore indeterminable, evidence of such

standard in similar Idaho communities at said time may be considered." The district court in *Hoene* granted defendant's motion for summary judgment on the ground that plaintiff's expert did not have actual knowledge of the relevant community standard as required by §§ 6–1012 and –1013. At the time of plaintiff's surgery, however, defendant was one of only six cardiovascular surgeons in Idaho, all of whom practiced together in Boise as a professional association. We noted that, under the "unique circumstances" of the case, no provider of the medical services at issue existed within Idaho other than the defendant and his associates. *Id.* at 754, 828 P.2d at 317. Because they practiced together as "one business entity," they were one "provider" under § 6–1012. *Id.*, 828 P.2d at 317. Thus, we concluded that the community standard of care pursuant to § 6–1012 was indeterminable. *Id.*, 828 P.2d at 317. We then turned to similar communities within Idaho, as provided by § 6–1012. *Id.*, 828 P.2d at 317. Because of the unique facts of the case, however, no similar communities existed within Idaho and §§ 6–1012 and –1013 did not apply. *Id.*, 828 P.2d at 317. We finally concluded that we had to consider the case law preceding the enactment of these statutes. *Id.*, 828 P.2d at 317.

In the case at bar, Morris argues that a situation similar to that in *Hoene* has occurred. Morris argues that doctors practicing in the Emmett community at the relevant time were either unavailable or biased in favor of Thomson and thus that Morris' expert, Dr. Giles, could properly testify regarding the standard of care in communities similar to Emmett. Morris, however, has ignored the central premise of our decision in *Hoene*. In that case, the plaintiff first demonstrated that no health care provider other than the defendant or his business associates practiced in the local community (Boise) and thus that the local standard of care was indeterminable. Only then did we turn to "similar communities" to establish the relevant standard of care. Under § 6–1012, Morris cannot establish the local standard of care by reference to similar communities until she has demonstrated that the standard of care in Emmett was indeterminable due to the absence of other health care providers in the community. In this case, however, Morris has failed to establish that no other health care provider was practicing in Emmett at the time of Jessie's birth through which her expert could have familiarized himself with the local standard of care. Because she did not demonstrate that the standard of care in Emmett was indeterminable, Morris could not use the standard of care in similar communities.

The district court thus properly instructed the jury regarding the standard of care in this case. First, the language of the instruction mirrors the language of I.C. § 6–1012 which this Court has approved as a correct explanation of the law. Second, the portion of the instruction limiting the consideration of the standard of care in similar communities to situations in which the local standard within the community is indeterminable was correct. Not only does it repeat the language of § 6–1012, but it also comports with the case law interpreting this section.

## IV.

## CONCLUSION

We hold that the trial court did not err in: (1) refusing to automatically dismiss for cause all potential jurors having a doctor-patient relationship with defendant Dr. Thomson, (2) refusing to dismiss for cause Juror Hill, (3) refusing to allow Morris to question Dr. Watkins regarding prior statements the witness made concerning her opinion as to the timing of Jessie's injuries, (4) striking that portion of Dr. Giles' testimony that referred to the standard of care requiring the use of a fetal scalp monitor, and (5) instructing the jury regarding the standard of care in medical malpractice cases. Furthermore, we hold that no error occurred when defense counsel spoke with Jessie's former treating physicians outside the course of formal discovery. Costs on appeal to respondent.

JOHNSON and McDEVITT, JJ., concur.

SILAK, J., concurs in parts I, II, III. A, B, C, E, F, and IV, and concurs in the result in part III. D.

**148**

SCHROEDER, Justice, specially concurring.

I concur in the result but caution that the Court's opinion in III. A. not be read broadly. The Court comments that, "[t]he doctor-patient relationship, however, does not create a clear risk of prejudice." Emphasis should be placed on the opposing concern. The doctor-patient relationship creates a serious risk of prejudice, and the determination of whether the patient should remain on the jury panel should be approached with extreme caution.

In most instances if there is actually a current doctor-patient relationship the juror will be disqualified for cause under I.R.C.P. 47(h)(3) as a debtor of the doctor. Ironically, most people are probably more concerned with retaining goodwill with their doctor than with a creditor. The doctor upon whom a prospective juror is dependent for on-going medical treatment of what may be intimate details of health is likely more important in the juror's life than the creditor who can be paid. Regardless, the doctor-patient relationship is not one of the bases for a challenge under I.R.C.P. 47(h). The district court approached the issue properly under existing law. The point remains, however, that this Court's ruling should be read cautiously.

Examination of the juror runs several risks. First, the doctor may have dealt with intimate, personal details of the juror's life. The juror may be hesitant to share a frank opinion under these circumstances. Additionally, examination of the juror runs the risk of constituting a sworn testimonial on behalf of the doctor that can influence other members of the panel. Extreme caution should be taken in limiting the type of examination of the juror that takes place in front of other jurors lest the entire panel be tainted.

Because the doctor-patient relationship is not enumerated as a basis for a challenge for cause in I.R.C.P. 47(h), and because the district court developed an appropriate record, I concur in the result, though I caution care in such cases.